This is Doe v. Samford. We'll start. So, Ms. Zuppler, you're going to present the opening and your co-counsel, Ms. Stone, is going to handle rebuttal. That's correct. Okay, thank you. Good morning, Your Honors. May it please the Court. Christina Zuppler and Susan Stone on behalf of Appellant John Doe. Your Honors, what's so compelling about John's case before this Court is that regardless of the standard applied, whether it's the use of standard or the Purdue standard, John has sufficiently pled that Samford's treatment of him was motivated by gender in violation of Title IX. In Samford's briefing, it's asking for an outright rejection of the use of standard, but no appellate court has done that. Rather, appellate courts across the country have agreed that the doctrinal tests contained within USIV are ways of raising the plausible inference that gender is a but-for cause of discrimination. And I emphasize a because that's a key issue in this case. Here, where the trial court erred… Yeah, I think the test that actually is the most tied to the text is the Seventh Circuit standard, but I agree with you that the Second Circuit standard at least provides a couple of ways of satisfying that, so I'm not sure how much we need to spend worrying about that. I tell you just from my perspective, we haven't talked about this case, but from my perspective, I'm not sure that there's a plausible allegation. There are allegations of facts that create a reasonable inference of sex discrimination as opposed to discrimination in favor of complainants without regard to what their sex is. Your Honor, I think the question or the point you've raised goes to the heart of Bostock, which has informed the trial court's evaluation of the motion to dismiss, and specifically the issue of discrimination, a but-for cause of discrimination versus the but-for cause. It's the only cause of discrimination, and this issue that Sanford has argued that, hey, wait a minute, just because Sanford's perhaps pro-complainant doesn't necessarily mean it is pro-female and thus gender biased against John Doe, but Your Honor, that issue… I don't understand their argument to be that they are pro-complainant, but that at most, that's what you have alleged. So this issue of being pro-complainant or perhaps merely attentive to the very important issue of campus sexual assault has been addressed repeatedly by the sister circuits, specifically in Doe v. Columbia, Doe v. Baum, Doe v. Minnesota, and Doe v. Denver, too. The courts explained the idea that discrimination need not be the only plausible explanation or even the most plausible explanation for a claim to proceed past the motion to dismiss stage. And again, I emphasize that because that's so essential here. At this point in the litigation, the court is not tasked with determining whether… …the claim proceeds. And so here, adopting, as the court suggests that the 11th Circuit may be inclined to do, the more holistic view set forth in Purdue and followed by countless other circuits, you have to look at the background indicia of sex discrimination, those pressures, both external and internal on Sanford, coupled with the procedural irregularities. And that holistic view is what allows the plausible inference of gender discrimination, that Sanford's actions towards John Doe were indeed motivated by discrimination. Here, your honors, I'd like to submit three particularly or draw the court's attention to three particularly compelling procedural errors that allow for the plausible inference of gender discrimination when viewed in the context of the other external and internal pressures Sanford faced. The first procedural irregularity of tremendous significance is the lack of proper notice that was afforded to John. He never received any written notice of the allegations against him prior to his interview. And indeed, when the trial court ruled on the motion to dismiss, the trial court entirely glossed over this issue of notice. And again, turning to other circuits, Menneker, Schwakey, Denver 2, so the 2nd, 9th, and 10th circuits, all contain case law, specifically recognizing this issue of lack of notice as being one that, when coupled with other issues, can raise that plausible inference. In addition to the lack of notice, the second procedural irregularity that I think... That was because the investigator didn't tell him why she needed to meet with him? Correct. So under Sanford's policy, there should have been an initial meeting, as well as written notice, and John received just a very broad email asking him to come in for a meeting. And it's also important to note... I think in your brief, you have done a good job of outlining the numerous problems that you identified in the process. I have a little bit of trouble of understanding where that crosses the line from either pro-complaintant or good faith error or using a new process into something that raises to the level of a gender bias as a reasonable inference. Certainly, Judge Brown. And I think that's where, again, adopting the Purdue standard, which calls for the holistic view, you turn to the background indicia of discrimination. So here you have to examine these procedural irregularities through the lens that John has pled that all respondents are male and all complainants are female. And if you examine the background pressures through that lens, it leads to the plausible inference sufficient to overcome the motion to dismiss. But that existence is not anything that can be attributed to Sanford, right? The background pressure... Well, Sanford faced external pressure. No, no. I'm saying the identity, the gender identity of the complainant and the respondent. That's not attributable to Sanford, though. Indeed, Your Honor, Sanford has taken that position. We don't control who presents as a complainant for a Title IX report. However, Sanford can control how the parties to a process are treated. Tell me the other two procedural, so you don't get off track, the other two procedural irregularities. You mentioned the first one, which was the lack of notice. What are number two and number three, please? Thank you, Judge Jordan. The second very significant procedural irregularity is the fact that through the investigation, Sanford has actually ignored or overlooked John's request for investigation to obtain exculpatory evidence. When the investigator met with the complainants, there were no questions about whether she consumed drug or alcohol prior to going to the party. That's a particularly significant issue here, because in the greater context, the hearing was the very first time that Jane claimed that her incapacitation was due to alcohol. From the beginning of the case up to the hearing, the focus was incapacitation due to drugs. And that, to come full circle, also ties to why the lack of notice to John is so significant here. Before you argue them, tell me the third one so we don't miss it. Understood, Your Honor. The third significant issue is just the overall weighing of credibility. The hearing panel accepted an entirely new theory from Jane without any inquiry whatsoever. The hearing, again, was the first time that Jane attributed her incapacitation to alcohol, not drugs. And that rises to the level of the plausible inference of gender discrimination, the lack of questioning on what brought this vast and sudden change in her story. It creates the plausible inference that the panel believed Jane because she was female. But aren't fact-finders often faced with witnesses who are impeached in one way or another and are nevertheless sometimes entitled to believe those witnesses despite the impeachment? And I think that's why, under the holistic view here, you look at the totality of what happened, the background pressures, coupled with the procedural irregularities. And I'd point the court's attention to a really key finding in Doe v. Regents, the supplemental authority that we filed and brought to Your Honor's attention. That court made the point that at some point in a case, the accumulation of errors against a male starts to look like a biased proceeding. It creates that plausible inference of gender bias. And this issue of, well, gee, courts are fact-finders in an administrative proceeding. Are you familiar with the Youth Sciences case? That case in the Third Circuit, Your Honor? Yes. So in that case, there's actually evidence or allegations that the school did not investigate allegations raised by two women. I'm sorry, allegations by the man against two women who were accusing him at the same time. And the court from that was able to say this is not pro-complainant bias and tie it to some inference of gender bias. Is there anything like that here, or are you simply saying there are so many errors that you have raised an issue of bias? I would submit, Judge Brown, that it's the accumulation of the errors here that, among other things, creates the inference of bias. This issue of credibility has also been addressed and recognized by both the Sixth Circuit and Doe v. Baum, and again in Denver, too. And finally, I just draw the court's attention to the statement outlined in the complaint made by the investigator. When receiving information from Jane Roe about her drugging being the cause of her incapacitation, Jane was asked whether she had any toxicology reports to provide in support of that. She did not, and the investigator responded, regardless, I think you couldn't give consent. That lens filtered the report that was written. Okay, you've saved for your co-counsel. Time for rebuttal. Mr. Pennington? It is the court of your honors. I'm James Pennington, and I represent Stanford University. You might turn the volume up, Mr. Pennington. You're so distant from the microphone, it's a little difficult to hear you. I'll yell for the moment while we turn that up. You're doing fine. Your Honor, I think it does matter that the court not adopt the erroneous outcome standard because it focuses not on what Title IX says that we need to focus on, it focuses on whether you get it right or not. But Mr. Pennington, that has to be, in at least certain cases, a relevant factor, right? In other words, if you have a case where there is no evidence whatsoever, right, and the university finds a person, male or female, liable for sexual misconduct, where there's no evidence to support the claim, that at least begins getting your antenna up, right, about what was going on. So I understand the argument that you can't focus on outcome exclusively, but you can't exclude it completely from the equation either, right? We agree with that, Judge Jordan. This is certainly not that case, though. And the construct, the analytical construct that is advocated in USIP changes the focus. It doesn't focus on whether it's one of many factors that may be considered. It focuses on whether you get it right. And I did want to point out, that is very inconsistent with this court's discrimination jurisprudence that goes back to 35 years, certainly in the employment context. In Jones v. Gerwin, this court said, even if a claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts the imprima facie case of disparate treatment by showing it honestly believed that the employee committed that violation. The same in Nix v. WLCY 738-2-1181. Nix may have shown that he was fired for violating a rule that he did not violate, but Title VII does not take away an employer's right to interpret its rules as it chooses and to make determinations as it sees fit under those rules. Title VII addresses discrimination, and that's what Title IX addresses, discrimination. And what is that? Judge Wisdom said it best back in Frosty Moore Meats in 1961 when he said, discrimination consists in treating like cases differently. That is the baseline for what is discrimination, and there is no allegation whatsoever in this case. And if, in a different case, the university exhibits bias against all the men, they're treating all the cases the same way, but there may be evidence of gender discrimination, right? There may be evidence of gender discrimination, but there's not here. And that lack of comparison, treating like cases differently, was enough for this court to dismiss in Whitaker just last year. They said, the Eleventh Circuit said the plaintiff and his comparator were not similarly situated. End of story. We're done. So, yes, theoretically, Your Honor, there could be ways of showing discrimination without direct evidence, but focusing on whether there were procedural errors and focusing on whether somebody else agreed with the decision that came out is inappropriate. I think it's... Back in 1978, the Supreme Court said a school is an academic institution, not a courtroom or an administrative hearing room. And then in a Title IX case, the seminal Title IX case, Davis v. Monroe-Hammond, the court said, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators. And I want to read from the complaint in this case. Paragraph 19. Paragraph 19 says, educational institutions designed to educate America's youth are ill-equipped to adjudicate allegations of sexual assault. That's why the court says you can't turn the judicial process, the quasi-judicial process at a college, into and impose the same standards that you impose upon a federal district court. You just can't do it. They're not judges. They're not lawyers, necessarily. That's not the standard that you have to apply. And that's certainly not what Title IX addresses in the first place. That is discrimination. But even if you did apply, it would not be appropriate to find a plausible case of sex discrimination in this enormous complaint. There are 250, roughly, allegations in this complaint. And taking all of them into account, they don't make the connection between any procedural error and sex discrimination. I want to please respond to the procedural errors that my opposing counsel mentioned. First was the lack of notice prior to the interview. Well, the complainant was off campus. They wanted to make sure that they addressed this properly and quickly. And they interviewed the complainant first. They told him, and it's alleged in the complaint, that he was told that he was alleged to have raped Jane Rose. That's all they knew at that time. And they told him that. But much more importantly than the timing is the fact that that was an initial interview, Your Honor. This case proceeded through a tremendously detailed investigative procedure where the plaintiff on two occasions was allowed to look at all the evidence that had been determined and then went to a full hearing represented by the same counsel he's represented by today before a completely separate and independent hearing panel. The plaintiff had the opportunity at that hearing to call into question all sorts of evidence, evidentiary issues, to directly cross-examine the plaintiff. That leads us to the second procedural error. The complaint is that they didn't ask about alcohol before the party during the investigation. But that was asked about in very much detail in the hearing before the decision was made, before anybody came to a conclusion of responsibility. Ms. Supler directly cross-examined the complainant on that issue. You're arguing a lot of facts that I don't think are included in the complaint, or at least not with the precision that you are alleging them. I may have gone too far, Your Honor, but my point is that it is alleged in the complaint there is a full hearing before an independent hearing panel and there's not one allegation in the complaint tying any of the members of that hearing panel to discrimination. From the complaint, the complaint doesn't even say who they are, much less that they were biased against Mabel. May I talk, please, for a moment about the But-For standard? This court applied the But-For standard in two Title IX cases that were retaliation cases. Those were Garrett v. Florida, 448 feds up, 1286. Oh, I'm sorry, that's the district court. And then Cox's v. Florida State, that's 788 fed appendix 680, 2019. So we've got a district court opinion and an unpublished opinion. Yes, sir, and there's another district court also. And we would say that I believe it's the Shepard case is the best case on that from another circuit. Title IX retaliation cases are the closest cases to Title IX discrimination cases like we have here. It's not like the deliberate indifference standards. So we think that it's important to apply those. But if you're alleging, or not alleging, if you are suggesting that we borrow some of the Title VII understanding in the Title IX context, Title VII doesn't always require a But-For. There are mixed motive cases, for example, under Title VII. And so if you're in for a penny, you're in for the pounds. You can't just analogize to a different title of the Civil Rights Act and say we should borrow aspects of it, but then not take other portions of it too. Well, we're asking the court for the same reasons that the court said in Cox's and the district court said in Garrett, that the middle district said in Nemeth v. Auburn, that's 2021 Westlaw 3375669. And also for the reasons that were asserted by the Fourth Circuit in Shepard v. Virginia State 993-230, that the But-For standard is appropriate. Not just borrowing from Title VII, but it is the applicable standard under Title IX. I mean, the text says on the basis of sex, right? Exactly, Your Honor. Isn't that what matters? I mean, everyone wants to tell me what some other circuits say. They don't want to talk about what the text of the statute says. Well, I do want to talk about that. That's exactly what Title IX prohibits. Title IX does not prohibit messing up in an adjudication. Title IX prohibits sex discrimination. That's what it's about. And so we want the court to focus on that. But I don't think there's been any focus in opposing counsel's brief about the fact that we do have a separate and independent hearing panel who makes judgments, who hears direct evidence, who hears the cross-examinations, and makes an independent determination. And then we also have here an appeal board composed of an entirely different set of people who listened to the arguments and came to the same conclusion again and found that the procedural errors were the result of two things. And that was the lack of experience of the investigator, not bias. And number two, we've got a new policy. In 2020, the Department of Education issued new regulations, required all the institutions to adopt policies consistent with those, and then immediately begin complying with those regulations and those policies. So I think it would be incredibly naive to expect that there wasn't some procedural error that occurred when you're dealing with entirely new procedures. That is not sufficient under any of these cases to infer sex discrimination. And even Yusuf said, the Yusuf case said, that alone, even with conclusory allegations of sex discrimination, is not sufficient to survive a motion to dismiss. So I've only got a couple minutes, but I did want to mention the selective enforcement claim. There was a selective enforcement claim, and we believe that analytical construct is artificial as well, but at least it's a little bit closer to what the court ought to be looking at under Title IX, and that is whether there has been a treatment of people differently. And there is simply no evidence whatsoever alleged in this complaint to show selective enforcement. There is no comparator. There is no female who he says was treated differently. In fact, the only thing that it says is that plaintiff was treated differently from how a female would have been treated if accused of similar offense. And that is not only speculative, not only conclusory, that's entirely hypothetical. That does not get you across the line for pleading to say, I was treated differently than somebody else might have been. The only other allegation is John says he was not treated as favorably as a female would have been in a Title IX investigation. That's simply made up. That is completely hypothetical and cannot get you over the pleading stand. It's not hypothetical. It might be conclusory. But there's no allegation that it's even happened. That's why I'm saying it's hypothetical. There's no saying that there's an actual person who's been treated differently because of sex. And the statistics that are alleged there also are completely outside the control of Sanford. Sanford has no control over who complains about harassment and therefore triggers an investigation. There's no allegation of statistics concerning how Sanford treated people who were respondents after an allegation. Okay. Thank you, Mr. Bennington. You've saved four minutes. May it please the court, your honors. I appreciate you indulging us in a rather unorthodox way of arguing a case by splitting the primary case and then the abuttal between counsel, but we like to share. Ironically, everything that my colleague said across the table is a summary judgment argument and only highlights why discovery is important, especially in Title IX cases. The case of Medicare v. Hospra says the defendants cannot hide by the fact and argue that we don't have the data to prove our complaint when they are in sole control of the statistics. Nothing could be more evident here. Let me bring you back to what Ms. Suppler argued, at least in part during her time. She said that one of the first procedural irregularities was the lack of notice. But Mr. Doe's complaint says that he was told that it was a rape allegation. So he received notice of what the interview was going to be about. What other notice was he required to be provided at that point? Under the school's own policy and under the Title IX regulations, that is insufficient notice. You have a right to know exactly the date, the policy violation, and what type of violation that would fall under the policy. It is not enough to say that you were raped, and in college terms that would be non-consensual sexual intercourse. By how? Was it lack of verbal consent or was it lack of consent due to incapacitation or by other means? In this case, he didn't know any theory of the case, and then after he was interviewed, Jane based her entire case on being drugged. And after that, his entire framework was, I didn't drug her. I didn't drug her. And then in the police report, there was reference to drugging. And what was more interesting in her response to his interview, she basically said, I have never suffered from the effects of alcohol. I was drugged. They did what the key procedural deficiency here because of the lack of notice was then the interview, the investigator never circled back to John and allowed him to rebut in an interview what Jane said. And even if he would have, he only had one interview of John Doe, he would have said, I didn't drug her. But now that you mean the second procedural irregularity is the lack of a second interview? No, Your Honor, the lack of procedural regularity is because he didn't have notice. He could only respond to the questions during his interview, which solely focused on the fact of, did you drug Jane Doe or Jane Roe? And he kept saying, I didn't drug her. And then he followed up and it's in the complaint and Ms. Supler argued with important questions that should have been asked prior to the hearing. First of all, please find out what did Jane Roe have to drink prior to coming to the party, and they wouldn't follow up on it. It was only at the hearing was there a shifting theory. Question one, paragraph 156 of the complaint, which was the complaint is if I'm going to take over for a couple of seconds, Chief, if that's okay. Yep. But the complaint doesn't say anything about what the interview with your client consisted of. Right. I disagree, Your Honor, respectfully. Okay, tell me, tell me where, tell me where I can find this, and it may not be necessary. Maybe you're right and we don't need any more. But are there specifics about what transpired between Ms. Crunterrod and Mr. Doe during that interview? Yes. If I look at paragraphs 120, 120, all the way through 125, which are the chronological statements about the interview with him, there's nothing. Absolutely correct. And that's the problem. All she basically asked him during his interview is, what did you put in the drink. No, no, I'm saying that that's not in the complaint. The specifics of the interview are not in the complaint. Right. Correct, Your Honor, but in 156 of the complaint, because his interview was so perfunctory, he wanted follow up to the complaint. He wanted to know what was the source of the, of the hickeys on her neck. Witness three said that Jane told witness to that she consented. Can we please see the same records and the medical reports to prove that I didn't drug her. Did she have alcohol or drugs before the party. Right, and that goes, and that goes to the second argument, which is the denial of follow up discovery, etc. So, thank you very much. I understand the, the answer now chief and that that. Chief May I ask a related question. Sure. Thank you. Your co counsel made the argument that this sort of got off on the wrong foot, because of the statement that you quote a couple of times from the investigator I still think regardless you couldn't could not give consent. But your co counsel tied that to some claim that she was unable to provide a drug test. Is that a specific claim in your complaint. It's not that she was unable. She didn't provide the results of the drug test. And that's why john asked for it. She is that in your complaint. Yes, Your Honor. Where I see that I see the quote is that 131 and 202. Yes, but in paragraph 156. That's why we asked for follow up to that very point. Okay, well it. I think I, I think I understand, similar to Judge Jordan it just doesn't seem to be a direct connection there but I appreciate it. Thank you. Thank you. Prior date. Miss stone. I think we have your case you've gone over but you've been answering questions from us. And so we're going to move on to the next case. Thank you.